UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

ST SHIPPING AND TRANSPORT, INC.,

       Plaintiff,

   - against -

GOLDEN FLEECE MARITIME INC.,

       Defendant.

BLANCA SHIPMANAGEMENT CO.,

       Third-Party Claimant.

------------------------------------------------------- X

**OPINION AND ORDER**

**07 Civ. 11147 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

On December 28, 2008, this Court entered an ex parte order on behalf

of ST Shipping and Transport, Inc., directing attachment and garnishment of the

assets of Golden Fleece Maritime Co.  Three hundred and eighty thousand dollars

having been seized, Golden Fleece and third-party claimant Blanca

Shipmanagement Co. now move to vacate that attachment on two separate

grounds.  *First*, they assert that the funds attached are not in fact the property of

Golden Fleece, as they were either held in trust for or had been assigned to

1

Blanca.[1]  *Second*, Golden Fleece claims that the attachment should be vacated on equitable grounds, as counsel for ST Shipping purportedly made false representations in its attorney affidavit in support of the attachment and failed to file the instant action as a related case.[2]  For the reasons stated below, the request to vacate the order of attachment is denied.

## II.    FACTS

### A.    The May 2003 Charter Party

On May 30, 2003, ST Shipping chartered the M/T Elli – a Liberian-flag oil tanker – from Golden Fleece for a period of six months, although the charter period was eventually extended until September 2006.[3]  The Elli is a double-sided tanker, although it is not technically double-hulled.[4]  Clause one of the charter stipulated that the Elli would be delivered to ST Shipping "fit to carry crude petroleum and/or its products" and "would have on board all certificates"

---

[1]    *See* Memorandum of Law in Support of Third Party Blanca Shipmangement Company's and Defendant Golden Fleece Maritime Inc.'s Motions to Vacate Maritime Attachment ("Def. Mem.") at 8-12.

[2]    *See id.* at 12-15.

[3]    *See* Verified Complaint ("Verified Compl.") ¶ 4.

[4]    *See Golden Fleece Maritime Inc. v. ST Shipping & Transp. Inc.*, [2007] EWHC 1890 (Commercial) ¶ 7 (U.K.), *aff'd*, [2008] EWCA Civ. 584 (U.K.) (quoting clause one, subclauses (b) and (g) of the charter).

necessary to enable it to perform the charter service.[5] More importantly, clause

three required the owners to "maintain or restore the conditions stipulated in"

clause one, regardless of the event necessitating such action.[6] The charter also

"warranted the speed and performance of the vessel during the period of the

contract."[7]

## B. The 2006 London Lawsuit and the First New York Attachment

The first dispute between ST Shipping and Golden Fleece arose due

to the Elli's noncompliance with international pollution regulations. On

December 4, 2003 – approximately seven months after entry of the charter party –

the International Maritime Organization issued new regulations under the

International Convention for the Prevention of Pollution from Ships ("MARPOL

Convention")[8] that tightly restricted the carriage of fuel oil in tankers that are not

---

⁵      *Id.* ¶ 8.

⁶      *Id.* (quoting clause three, subclause (i) of the charter).

⁷      Verified Compl. ¶ 5.

⁸      International Convention for the Prevention of Pollution From Ships,
Nov. 2, 1973, 12 I.L.M. 1319, 1340 U.N.T.S 184 (entered into force Oct. 2, 1983).
*See also* Protocol of 1978 Relating to the International Convention for the
Prevention of Pollution from Ships, Feb. 17, 1978, 17 I.L.M. 546, 1340 U.N.T.S.
61 (entered into force Oct. 2, 1983).

3

fully double-hulled, such as the Elli.[9] These regulations were slated for entry into force on April 5, 2005.[10]

Initially, representatives of Golden Fleece repeatedly assured ST Shipping that the Elli – along with the M/T Frixos, another vessel ST Shipping had chartered from Golden Fleece – conformed to a regulatory exception to the new MARPOL standards.[11] However the vessels had previously been officially designated "Segregated Ballast Tanks-Protected Location" vessels and were incontestably subject to the MARPOL prohibition.[12] After unwittingly allowing the vessel to transport fuel oil illegally for a short period, ST Shipping learned of the Elli's non-compliance.[13] As a result, a subcharter agreement between ST and a third company – Tianbao (Hong Kong) Energy Co. – was terminated in August 2006,[14] and a dispute concerning the resulting loss of revenue developed between

---

[9] *See Golden Fleece Maritime Inc.*, [2007] EWHC 1890 ¶¶ 14-19.

[10] *See id.* ¶ 15.

[11] *See id.* ¶ 22.

[12] *Id.* ¶¶ 14, 22.

[13] *See id.* ¶ 21.

[14] *See id.* ¶ 23.

4

ST Shipping and Golden Fleece.[15]

On May 11, 2007, ST Shipping brought a request for an ex parte attachment of Golden Fleece's assets before Judge Denise Cote of this Court, seeking security for claims pending in the London litigation.[16] That same day, Judge Cote granted an ex parte order for maritime attachment and garnishment of up to $481,307.94.[17] However, ST Shipping failed to attach any of Golden Fleece's assets prior to its victory in the London litigation on August 2, 2007.[18] The British judgment mandated payment by August 20, 2007, and payment was in fact made by that date.[19] Because it no longer had an outstanding claim, ST Shipping filed a notice of dismissal of its attachment action on August 22, 2007.[20] The Clerk of the Court failed to close the case until Judge Cote endorsed ST

---

[15]     *See id.*

[16]     *See* 5/11/07 Verified Complaint, Ex. A to Def. Mem.

[17]     *See* 5/11/07 Ex Parte Order Directing Process of Maritime Attachment and Garnishment, Ex. B to Def. Mem.

[18]     *See* 7/17/08 Affidavit of John R. Foster, plaintiff's attorney ("Foster Aff.") ¶ 6.

[19]     *See* 8/4/08 Declaration of Duncan McDonald, defendant's London solicitor ("Second McDonald Decl."), ¶ 7.

[20]     *See* 8/22/07 Notice of Dismissal, Ex. 4 to Foster Aff.

5

Shipping's notice of dismissal on May 9, 2008.[21]

## C. The 2007 London Arbitration

On March 15, 2007, while the lawsuit over the MARPOL regulations was pending, ST Shipping gave Golden Fleece notice of a separate potential claim concerning breach of the speed and fuel consumption performance guarantees contained in the May 30, 2003 charterparty.[22]  On October 10, 2007, ST Shipping presented Golden Fleece with a demand for $200,000 security based on early estimates of performance claims related to the Elli.[23]  Golden Fleece refused the demand for security, as it disputed the validity of the underlying claim.[24]

## D. Sale of the M/T Elli

On October 10, 2007 – the same day that ST Shipping presented its demand for security concerning the 2007 London arbitration – Golden Fleece

---

[21]     *See* 6/30/08 Civil Docket for Case #: 1:07-cv-03730-DLC, Ex. C to Def. Mem..

[22]     *See* 3/15/07 Fax Transmission, Ex. A to 7/17/08 Declaration of Edward H. Mills-Webb, plaintiff's London solicitor.

[23]     *See* 10/10/07 Fax Transmission, Ex. B to 12/20/07 Declaration of Edward H. Mills-Webb, plaintiff's London solicitor ("First Mills-Webb Decl."). Plaintiff also sought $500,000 in security for performance claims related to the Frixos. *See id.*

[24]     *See* First Mills-Webb Decl. ¶ 5; Second McDonald Decl. ¶ 6.

began discussions concerning the sale of the Elli,[25] the sole vessel it still owned.[26]

On October 26, 2007, Golden Fleece signed a Memorandum of Agreement

("MOA") and accompanying Side Letter initiating the sale of the Elli to "Blanca

Ship Management Company of [the] Marshall Islands or another company

TBN."[27] Blanca had been incorporated in the Marshall Islands on October 25,

2007,[28] the day prior to the signing of the MOA and Side Letter, fifteen days after

initiation of the negotiations, and a month after the inspection date listed in the

MOA.[29] By its express terms, the sale was "to be kept strictly private and

confidential."[30]

---

[25]     *See* 7/3/08 Declaration of Nancy R. Peterson, defendant's attorney ("Peterson Decl."), ¶ 16.

[26]     *See* 2007-2008 Lloyd's Register List of Shipowners & Managers at 518, Ex. 6 to Foster Aff. By that point, the Frixos had already been sold to another single-ship corporation, although it remained under the management of Liquimar Tanker Management. *See id.* at 519.

[27]     10/26/07 MOA, Ex. 2 to 7/3/08 Declaration of Marios Iliopoulos, Commercial Manager, Blanca Shipmanagement Co. ("Iliopoulos Decl."). *Accord* 10/26/07 Side Letter "A" to the Memorandum of Agreement Dated 26th October 2007 for the Sale of M/T "ELLI" ("Side Letter"), Ex. 3 to Iliopoulos Decl.

[28]     *See* 3/4/08 Registrar of Corporations Certificate of Good Standing, Ex. 1 to Iliopoulos Decl.

[29]     *See* MOA ¶ 4(a) ("The Buyers have also inspected the Vessel at/in Haldia on 25th/26th September 2007.").

[30]     *Id.* ¶ 18.

7

The MOA provided a price term of twenty-five million dollars, ninety percent of which was to be paid on the date of closing and delivery.[31] Although the expected date of delivery was set for January 17, 2008, closing and delivery did not in fact occur until March 17, 2008.[32] However numerous terms contained within the Side Letter took effect prior to the closing. First, after December 15, 2007, Blanca became "entitled absolutely to all payments of hire made to or to be made by charterers."[33] According to the Side Letter "[A]ll such payments shall be the absolute property of the Buyers and shall be held by the Sellers on behalf of the Buyers."[34] On the other hand, Blanca became liable on that date for the Elli's operating expenses, stated in the Side Letter to be approximately $8,000 per day.[35] Moreover, Blanca became liable for claims, losses, and damages to the Elli on or after December 15.[36]

Both before and after the sale, the Elli has been part of the Liquimar

---

[31]   *See id.* ¶¶ 2-3.

[32]   *See* Peterson Decl. ¶¶ 17, 22.

[33]   Side Letter ¶ 1.

[34]   *Id.*

[35]   *See id.* ¶ 2.

[36]   *See id.* ¶¶ 3-4.

8

Tanker Management fleet.[37] In fact, the Side Letter required that the Elli continue

to be managed by Liquimar and that any change in management required a

unanimous decision by Blanca's shareholders.[38] Shipping fleets are often

organized as a set of one-ship corporations – limiting the spread of liability within

the fleet – while the beneficial ownership rests in a single entity.[39]

### E. The Present Attachment

On December 11, 2007, ST Shipping filed a verified complaint

demanding maritime attachment of Golden Fleece's assets as security for the

claims pending in the London Arbitration.[40] ST Shipping did not indicate on the

civil cover sheet that the case was related to "a civil case now pending in

---

[37] *See* Foster Aff. ¶ 13. *See also* 7/17/08 Website of Liquimar Tanker
Management Inc., Ex. 5 to Foster Aff. (presently listing the Elli); 2007-2008
Lloyd's Register List of Shipowners & Managers, at 519 (listing the Elli as
managed by Liquimar Tanker Management during the period it was owned by
Golden Fleece).

[38] *See* Side Letter ¶ 5.

[39] *See* Foster Aff. ¶¶ 12-13. *Accord Hidrocarburos y Derivados, C.A. v.
Lemos*, 453 F. Supp. 160, 172-75 (S.D.N.Y. 1977) (Haight, J.); Md. Rizwanul
Islam, *The Arrest of Ship Conventions 1952 and 1999: Disappointment for
Maritime Claimants*, 38 J. Mar. L. & Com. 75, 79 (2007). The 2007-2008 Lloyd's
Register List of Shipowners & Managers lists Golden Fleece only as a cross-
reference to Liquimar. *See* 2007-2008 Lloyd's Register List of Shipowners &
Managers, at 334.

[40] *See* Verified Compl. ¶¶ 4-8.

S.D.N.Y.,"[41] and the affidavit of plaintiff's attorney attached to the complaint

stated, "This application is the Plaintiff's first request for such relief to any

court."[42] On December 28, 2007, this Court authorized an ex parte order of

maritime attachment in the amount of $380,000.[43]

On January 18, 2008, January 30, 2008, and March 17, 2008,

Citibank restrained three electronic funds transfers ("EFTs") from Indian Oil

Corporation.[44] Each EFT named Golden Fleece as its beneficiary and was routed

to Golden Fleece's bank account, the same account named in the MOA as the

destination of sale payments.[45] These funds were hire payments made by Indian

---

[41] 7/13/07 Civil Cover Sheet, Ex. A to Reply Memorandum of Law in Support of Third Party Blanca Shipmanagement Company's and Defendant Golden Fleece Maritime Inc.'s Motions to Vacate Maritime Attachment.

[42] 12/10/07 Affidavit of John R. Keough, III, plaintiff's attorney, Ex. D to Def. Mem., ¶ 5.

[43] *See* 12/28/07 Ex Parte Order Directing Process of Maritime Attachment and Garnishment, Ex. 1 to Foster Aff.

[44] *See* 1/18/08 E-mail from Rodd Corner, Citibank, to John R. Foster, plaintiff's attorney, Ex. 3 to Foster Aff.; 1/30/08 E-mail from Mary B. Mihalik, Citibank, to John R. Foster, plaintiff's attorney, Ex. 3 to Foster Aff.; 3/17/08 E-mail from Mary B. Mihalik, Citibank, to John R. Foster, plaintiff's attorney, Ex. 3 to Foster Aff.

[45] *Compare, e.g.*, 1/18/08 E-mail from Rodd Corner, *with* MOA ¶ 3.

Oil for the charter of the Elli at times after December 15, 2007.[46]

In a May 1, 2008, joint status report to the Court, the parties indicated that defendant's counsel had "been approached by a third party claiming ownership of the attached funds."[47] At a conference held to address plaintiff's request to increase the quantity of funds subject to the attachment order, defendant's attorney asserted that he was "being retained by a third party that claims to own the funds that have already been attached."[48] Defendant's attorney did not name his new client; rather he described them as a "third party in Hong Kong."[49] Specifically, defendant's counsel stated that the EFTs at issue had been "assigned derivatively" to the unnamed third party.[50] Blanca appeared as a third-party claimant on July 3, 2008, the same date as the filing of the instant motion.[51]

## III. LEGAL STANDARD

---

[46] *See* 7/3/08 Declaration of Alexandra Chatzimichailoglou, in-house counsel, Liquimar Tankers Management Inc., ¶¶ 7-8.

[47] 5/1/08 Letter from John R. Foster, plaintiff's attorney, to the Court.

[48] 5/28/08 Hearing at 7:10-12.

[49] *Id.* at 7:23-8:1.

[50] *Id.* at 8:3.

[51] *See* Notice of Appearance by Nancy Rebecca Peterson on behalf of Blanca Shipmanagement Company.

11

## A. Vacatur Under Rule E(4)(f)

Supplemental Rules B and E of the Federal Rules of Civil Procedure govern attachment of assets in maritime actions. If the defendant is not present within a district, Rule B allows for the attachment of the defendant's assets up to the amount in dispute.[52] Rule E entitles a party claiming interest in attached property to "a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated."[53] The Second Circuit has held that in addition to meeting the service and filing requirements of Rules B and E, a plaintiff opposing vacatur of an attachment must show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment."[54] "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E."[55]

Whether or not the property attached belongs to the defendant must

---

[52]   *See* Fed. R. Civ. P. Supp. R. B(1)(a).

[53]   Fed. R. Civ. P. Supp. R. E(4)(f).

[54]   *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006).

[55]   *Id.* at 445 n.5.

be demonstrated by a preponderance of the evidence.[56] Although the Second

Circuit stated in *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd.* that the

plaintiff must demonstrate a prima facie case, this standard only applies to the

requirement that the plaintiff present a valid admiralty claim.[57] A lesser burden is

logically required with regard to that first factor, as the admiralty claim itself is not

being litigated before the court issuing an attachment. However absent proof that

defendant's property exists within the district, this Court would lack personal

jurisdiction.[58] Therefore plaintiff must establish jurisdiction by a preponderance

of the evidence.[59]

      The types of property subject to attachment are broadly defined as

---

[56] *See Dolco Inv., Ltd. v. Moonriver Development, Ltd.*, 486 F. Supp. 2d 261, 269 (S.D.N.Y. 2007) (requiring the plaintiff to prove on the record before the court that the property attached belongs to the defendant). *Accord Winter Storm Shipping Ltd. v. TPI*, 310 F.3d 263, 276 (2d Cir. 2005) (quoting Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B*, 20 J. Maritime Law & Commerce 521, 530 (1989)).

[57] *See, e.g., Proshipline Inc. v. Aspen Infrastructures Ltd.*, 533 F. Supp. 2d 422, 426 (S.D.N.Y. 2008).

[58] *See Winter Storm*, 310 F.3d at 268.

[59] *Cf. Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) ("VW also argues that it need establish only a prima facie case in order to defeat a Rule 12(b)(2) motion. We disagree. To prevail, a plaintiff must demonstrate by a preponderance of the evidence that in personam jurisdiction exists.").

13

"defendant's tangible or intangible personal property."[60] Defendant's property interest need not be exclusive,[61] but "[i]f the funds are in fact not the property of a named defendant, the attachment must be vacated."[62] Mere labeling of a party as the recipient of an EFT is insufficient to establish a property interest in the funds.[63]

## B. Equitable Vacatur

Even if an attachment complies with the Supplemental Rules, a court may order vacatur on equitable grounds. Equitable attachment is merited if "1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for

---

[60]    Fed. R. Civ. P. Supp. R. B(1). *Accord Winter Storm*, 310 F.3d at 276 ("It is difficult to imagine words more broadly inclusive.").

[61]    *See HBC Hamburg Bulk Carriers GmbH & Co. KG v. Proteinas y Oleicos S.A. de C.V.*, No. 04 Civ. 6884, 2005 WL 1036127, at *4 (S.D.N.Y. May 4, 2005).

[62]    *Chiquita Int'l Ltd. v. M/V Bosse*, 518 F. Supp. 2d 589, 593 (S.D.N.Y. 2007).

[63]    *See Egyptian Navigation Co. v. Baker Invs. Corp.*, No. 08 Civ. 2080, 2008 WL 1748456, at *3 (S.D.N.Y. Apr. 14, 2008). *But see Chiquita Int'l*, 518 F. Supp. 2d at 594 ("[I]t is undisputed that the funds were directed to or from defendant Holy House's bank accounts. Holy House's intended use of the funds that were in its account is irrelevant here.") (citations omitted).

14

the potential judgment, by attachment or otherwise."[64] A decision of this Court

has also found vacatur warranted where a party to a pending matter in which both

parties have appeared files an additional complaint and request for ex parte

attachment in an effort to take "advantage of the ex parte nature of a Rule B

order."[65] The defendant carries the burden of proof concerning equitable

vacatur.[66]

## C. English Law

Although formerly addressed as a question of fact, determination of

foreign law "is now a question of law."[67] The parties do not dispute that English

law governs the validity of the purported trust or assignment.[68]

### 1. English Trusts

Under English law, creation of a fixed trust requires that the settlor

---

[64]   *Aqua Stoli*, 460 F.3d at 445.

[65]   *Chiquita Int'l*, 518 F. Supp. at 599-600.

[66]   *See Williamson v. Recovery Ltd. P'ship*, Nos. 07-548, 07-746, — F.3d —, 2008 WL 3876570, at *5 (2d Cir. Aug. 22, 2008).

[67]   *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 454 (S.D.N.Y. 2007). *Accord* Fed. R. Civ. P. 44.1.

[68]   *See* Def. Mem. at 9-11; Plaintiff's Memorandum of Law in Opposition to Motions to Vacate Maritime Attachment and to Dismiss Action ("Pl. Mem.") at 9.

"evinces with reasonable certainty" four factors: intent to create a trust with

property intended to be kept separate from the trustee's personal property, trust

property, intended beneficiaries, and a trust purpose.[69] "Whether an intention to

create a trust is sufficiently evinced is in each case a question of interpretation"

and "may be inferred from the context."[70] Technical language is unnecessary,

although it may provide evidence of the intention to establish a trust.[71] Similarly,

failure to place funds in a trust account is not necessarily fatal, although when

trust funds are commingled with the trustee's assets, the trust agreement should

spell out the amount of money to be transferred, the time period in which it will be

transferred, and that the amount held in the account will never fall below the

amount held in trust.[72]

Uncertainty concerning essential elements of a fixed trust will void

the arrangement. Specifically, the trust agreement must spell out an arrangement

whereby the beneficiaries are ascertainable at the outset or will be ascertainable

---

[69]     *Underhill and Hayton: Law Relating to Trusts and Trustees* § 8.1(1)
(David Hayton, Paul Matthews, & Charles Mitchell eds., 17th ed. 2006).

[70]     *Id.*

[71]     *See id.* § 8.2.

[72]     *See id.* § 8.7. *See also id.* ("[T]he absence of [a requirement to keep
moneys separate], if there are no other indicators of a trust, normally negatives
it.").

16

under fixed principles at the time when assets are to be distributed.[73]  Similarly, a trust will be void if the res to be distributed among beneficiaries is not ascertainable at the time the trust is established.[74]  A trust for future property is only valid if the beneficiary provides consideration to the settlor.[75]

Trust property within a distinct trust account is immune to the claims of a trustee's private creditors.[76]  However if a trust exists but funds are not segregated, a court must determine whether particular property belongs to the trust or to the trustee.[77]

## 2. English Assignments

Where a settlor fails to establish a legally valid trust, the financial arrangement may in some cases become an assignment.  An assignment is "effectual in law" only when it is absolute and in writing under the hand of the assignor and when express notice has been given to the debtor whose debt has

---

[73]    *See id.* § 8.42.

[74]    *See id.* § 8.14(1).

[75]    *See Holt v. Heatherfield Trust*, [1942] 2 K.B. 1, 5.

[76]    *See Underhill & Hayton* § 1.1(2).

[77]    *See id.*

been assigned.[78]  When notice has not been given, the assignment is incomplete

and is a mere equitable assignment.[79]  Even an equitable assignment requires clear

intent to assign and an affirmative act showing that the assignor is passing the

"chose" – the subject of the assignment – to the assignee.[80]

As a general matter, a creditor of the assignor cannot attach a debt

already assigned to another.[81]  Attachments – known in England as Mareva

injunctions – will not be permitted to interfere with "a bona fide commercial

agreement which regulates how particular assets are to be dealt with."[82]  However,

this protective arrangement is limited to "bona fide transactions agreed at arm's

length with a third party in the ordinary course of business."[83]

### D.    Voluntary Dismissal Under Rule 41(a)(1)

Under Rule 41(a)(1) of the Federal Rules of Civil Procedure, "the

---

[78]     Law of Property Act, 1925, 15 & 16 Geo. 5, c. 20, § 136(1) (U.K.).
*Accord* 1 *Chitty on Contracts* § 19-006 (H.G. Beale ed., 29th ed. 2004).

[79]     *See Warner Bros. Records Inc. v. Rollgreen Ltd.*, [1976] Q.B. 430.
*Accord Egyptian Navigation*, 2008 WL 1748456, at *4 (applying English law).

[80]     1 *Chitty on Contracts* § 19-004.

[81]     *See id.* § 19-066.  *Accord Holt*, 2 K.B. at 14.

[82]     Steven Gee, *Commercial Injunctions* § 13.034 (5th ed. 2004).

[83]     *Id.*

plaintiff may dismiss an action without a court order by filing a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment."[84] Filing a notice of dismissal under this provision with the clerk of the court "itself closes the file."[85] Although voluntary dismissal after receipt of an answer or a motion for summary judgment requires a court order,[86] in a 41(a)(1) dismissal "the court has no role to play."[87] Thus although proposed voluntary dismissals after an answer or motion has been served must be sent to the judge prior to docketing, Rule 41(a)(1) dismissals may be electronically filed by a plaintiff.[88]

## IV. DISCUSSION

---

[84]     Fed. R. Civ. P. 41(a)(1)(A)(i). This mechanism acts "[s]ubject to Rules 23(e), 23.1(c), 23.2 and 66 and any applicable federal statute." Fed. R. Civ. P. 41(a)(1)(A). None of these exceptions are relevant to this case.

[85]     *Thorp v. Scarne*, 499 F.2d 1169, 1176 (2d Cir. 1979).

[86]     *See* Fed. R. Civ. P. 41(a)(2).

[87]     *Thorp*, 499 F.2d at 1176.

[88]     The Local Electronic Case Filing Rules and Instructions do not suggest a different outcome. The governing principle of Rule 18.4 is that "[a]ny document that requires the signature of a Judge should not be electronically filed." Local Electronic Case Filing Rules & Instructions Rule 18.4, Ex. F to Def. Mem. Therefore only "*proposed* orders, judgments, stipulations, voluntary notices of dismissal or consents" are included in the Rule. *Id.* (emphasis added). A Rule 41(a)(1) dismissal is not proposed when it is filed; it is complete and effective.

19

Historically, maritime attachment has ensured satisfaction of

judgments in a world where ships and their owners can sail away from a court's

jurisdiction, never to be seen again.[89] As this case demonstrates, in modern

commerce claimants must fear more than the physical disappearance of a ship;

they must be wary of the legal disappearance of a shipowner.

## A.   **Legal Vacatur**

Three of the four *Aqua Stoli* factors are undisputed in this case.   ST

Shipping has a valid prima facie admiralty claim against Golden Fleece in ongoing

London Arbitration.[90]  Golden Fleece cannot be found within the district.[91]  Nor

has Golden Fleece suggested that there is a statutory or maritime law bar to the

attachment.[92]  The sole dispute is whether the seized assets are the defendant's

property.  Although each of the EFTs were directed to Golden Fleece and routed

into the same account in which Golden Fleece received the proceeds from the sale

of the Elli, Golden Fleece and Blanca claim that the funds were in fact held in trust

---

[89]     *See Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*,
85 F.3d 44, 48 (2d Cir. 1996).

[90]     *See* Verified Compl. ¶ 7.

[91]     *See id.* ¶ 11.

[92]     *See* Def. Mem.

for Blanca.[93] In the alternative, Golden Fleece and Blanca accept the suggestion of ST Shipping that the arrangement was in fact an equitable assignment.[94]

### 1. Trust Property

Applying the facts of this case to the standards of English law, Golden Fleece did not evince sufficient intent to establish a trust on behalf of Blanca. Although Golden Fleece presents a colorable argument that the necessary elements of a trust exist, taken in context the Side Letter fails to demonstrate the requisite intent concerning the four required elements.

First, although the Side Letter demonstrates that Golden Fleece intended that Blanca would receive the payments of hire after December 15, 2007, the absence of basic trust terminology in an otherwise sophisticated commercial agreement provides strong evidence of a lack of intent to create a trust rather than an assignment of the debt. Similarly, the fact that funds were routed to the same bank account Golden Fleece used for receipt of the sale payments shows that Golden Fleece took no action to segregate funds or otherwise protect funds in which it purports to hold no beneficial interest. The Side Letter contained only

---

[93]     *See* Pl. Mem. at 11-12; 6/3/08 Declaration of Duncan McDonald, defendant's London solicitor, ¶¶ 8-10; Second McDonald Decl. ¶¶ 12-39.

[94]     *See* Pl. Mem. at 9-11; Second McDonald Decl. ¶¶ 40-48.

vague guarantees that Golden Fleece would "promptly account" to the buyers and no assurance that the general account balance would never fall below the amount held in trust.[95]

Moreover, the trust beneficiary is not set out with sufficient certitude. Specifically, the Side Letter defines "Buyers" as "Blanca Shipmanagement Company of Marshall Island or another company TBN."[96] Although Golden Fleece argues that the beneficiary must either be Blanca or a company nominated by Blanca to receive the hire, there is in fact no indication in the Side Letter as to who may name the alternative beneficiary. Thus "no criteria can be ascertained from the trust instrument or other admissible evidence for determining exactly who can be" named as the trust beneficiary.[97]

## 2. Equitable Assignment

Because the Side Letter does not create a trust, this Court must next determine whether Golden Fleece successfully assigned income related to the Elli to Blanca. Although this Court finds that the funds were subject to an equitable assignment, that assignment occurred outside Golden Fleece's normal course of

---

[95] Side Letter § 1.

[96] *Id.*

[97] *Underhill and Hayton* § 8.42.

business. Therefore the arrangement does not protect the EFTs in question from attachment by a creditor of the assignor.

The parties do not contest that the Side Letter does not create a legal assignment, as no notice of the arrangement was sent from Blanca to Indian Oil, the debtor. However the remaining two elements – those necessary for an equitable assignment – are present. First, the arrangement was absolute, providing that payments were to become the "absolute property" of the Buyers.[98] Moreover, the arrangement was in writing under the hand of the assignor, Golden Fleece. Ordinarily, an equitable assignment would shield the assigned assets from the creditors of Golden Fleece or – more specifically – a potential judgment creditor such as ST Shipping.

However, equitable assignment will only protect a judgment debtor when the transaction occurs in the ordinary course of business.[99] Sale of the sole ship owned by a maritime corporation cannot be considered a transaction "in the

---

[98]     Side Letter ¶ 1.

[99]     The assignment also raises substantial concerns related to the first requirement for protection of equitably assigned assets from the assignor's creditors: that the assignment be bona fide and conducted at arm's length. However, since the question of whether the assets are protected is more easily addressed through the ordinary course of business requirement, this Court need not address the validity of the transaction.

ordinary course of business."[100] This is a logical and justified rule, as it prevents a

company from simultaneously ridding itself of assets from which creditors could

seek satisfaction and assigning away the proceeds of such a sale, rendering the

corporation judgment proof. Therefore the EFTs at issue – while subject to an

equitable assignment for which Blanca can seek satisfaction from Golden Fleece –

still remain the property of Golden Fleece for the purpose of attachment by

creditors and potential creditors such as ST Shipping. Therefore all of the *Aqua*

*Stoli* factors are fulfilled, and the motion to vacate for failure to meet the

requirements for a maritime attachment is denied.

## B.    Equitable Vacatur

As officers of the court, attorneys maintain a duty of honesty in all

proceedings.[101] This obligation is at its apex when the court must rely on the

verified submissions of counsel before issuing an order ex parte.[102] The

---

[100]    *Commercial Injunctions* § 13.034. *Cf. Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, — U.S. —, 128 S. Ct. 2326, 2330 (2008) (describing sale of the assets central to a company's trade as outside the ordinary course of business).

[101]    *See* N.Y. Disciplinary Rule 7-102(A)(5); *see also* Model Rules of Prof'l Conduct R. 3.3.

[102]    *See Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805, 810 (S.D.N.Y. 2001).

conformance of the extraordinary maritime attachment remedy with the strictures of due process "is premised on the assurance that plaintiffs and their counsel will act with care and candor."[103] That being said, accusations of unethical conduct and efforts to deceive this Court should not be lightly made.[104]

Golden Fleece and Blanca do not claim that ST Shipping has engaged in any conduct previously found to require equitable vacatur. There is no evidence before this Court that Golden Fleece is subject to suit in an adjacent jurisdiction, that it is subject to personal jurisdiction where ST Shipping is located, that it had given ST Shipping security concerning the claims in London Arbitration, or that it had appeared in another action pending before this Court prior to the filing of this case. Rather Golden Fleece and Blanca assert that false statements before this Court have deprived Golden Fleece of due process. Even assuming arguendo that such false statements would provide sufficient grounds for equitable vacatur, ST Shipping and its counsel have done no wrong.

---

[103]  *Centauri Shipping Ltd. v. Western Bulk Carriers, KS*, 528 F. Supp. 2d 197, 203 (S.D.N.Y. 2003).

[104]  *Cf. Macmillan, Inc. v. American Express Co.*, 125 F.R.D. 71, 79 (S.D.N.Y. 1989) (noting that sanctions on attorneys "are very serious, and courts should not impose them lightly"). Such accusations are particularly troubling when they come from Golden Fleece, who the Queen's Bench in London reprimanded for deceiving ST Shipping during their commercial dealings. *See Golden Fleece Maritime Inc.*, [2007] EWHC 1890 ¶ 23.

First, ST Shipping did not mislead this Court by leaving blank the box on the Civil Cover Sheet that indicates that "this case is related to a civil case now pending in S.D.N.Y."[105] As described above, ST Shipping had closed its prior attachment action by means of a Rule 41(a)(1) dismissal on August 22, 2007, months before filing this action. As the court has no role to play in a Rule 41(a)(1) dismissal, Judge Cote's later endorsement of the dismissal notice has no effect on the legal status of that first case, even if endorsement proved necessary for docketing purposes. Therefore there was no pending case.

Moreover, counsel for ST Shipping did not mislead this Court when he stated that the instant action was the first request for relief to any court concerning this particular request for security. The central focus of a complaint seeking maritime attachment is the particular maritime claim at issue, rather than any long-term relationship between the parties. Thus the fact that this action stems from the same charter as the previous case before Judge Cote is irrelevant. Had ST Shipping previously filed a complaint concerning the same dispute and been denied an ex parte order of attachment, Golden Fleece would have grounds to assert that its adversary had materially misled the Court. That is not this case. Therefore the motion to vacate on equitable grounds is denied.

---

[105]     Civil Cover Sheet.

26

## V.    CONCLUSION

For the foregoing reasons, the motion to vacate plaintiff's attachment

is denied. The Clerk of the Court is directed to close this motion (docket no. 19).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              September 9, 2008

## - Appearances -

**For Plaintiff:**

John R. Foster, Esq.
John R. Keough, III, Esq.
WAESCHE, SHEINBAUM, & O'REGAN, PC
111 Broadway
New York, New York 10006
(212) 227-3550

**For Defendant and Third-Party
Claimant:**

Patrick F. Lennon, Esq.
Nancy R. Siegel, Esq.
LENNON, MURPHY & LENNON, LLC
420 Lexington Avenue, Suite 300
New York, New York 10170
(212) 490-6050